The opinion of the Court was delivered by
-contra.
Inglis, Oh.
James Graham, who is within the conscript age, had, as the overseer of Eliza E. North, and at her instance, been, on the 21st December, 1863, exempted from military service for one year from that date, under the authority of the second section’ of the Act of Congress, approved May 1st, 1863, entitled “An Act to repeal certain clauses of an Act to exempt certain persons from military service,” dec. On the 1st May, instant, and therefore before the expiration of this exemption, the enrolling officer for Anderson District, supposing that by the ‘Act to organize forces to serve during the warf approved Eebruary 17, 1861, the exemption thus previously granted had been revoked, caused Graham to be arrested and detained as a conscript. Upon an inquiry into tbe sufficiency of the causes of arrest and detention had in a proceeding by habeas corpus, the Judge below considered that, by a compliance with the terms prescribed in the earlier Act, (of May 1st, 1863,) a right to exemption from military service for the full term mentioned in the certificate of exemption had been acquired, and that the repealing clause of the later Act (of Eebruary 17th, 1861) did not operate retrospectively so as to defeat or divest that right; and thereupon, ordered the discharge of the prisoner. The correctness of this judgment is brought into question by the appeal of the Commandant of Conscripts, which has been heard in this Court.
The Act of Eebruary 17th, 1861, (section 10,) repeals all former laws granting exemptions from military service, and *283 defines the persons and classes of persons who should alone be thereafter exempted. Certainly, by this enactment, the previous law of May 1st, 1863, was repealed; and no one could therefore subsequently procure an exemption from military service for an overseer upon paying five hundred dollars into the public treasury, and otherwise conforming to the conditions prescribed in that law. But the inquiry here is, whether the arrangement long before consummated under the authority of that earlier law, between the government and Eliza E. North, executed on the one part by the payment of the stipulated consideration, and on the other by the grant of a eertifioat#of exemption, was, by this later Act, at onqe discontinued, so as to deprive her of the benefit of the unexpired portion of the term. The solution of this inquiry will not need a discussion of the competency of the Confederate Congress, constitutionally or otherwise, to accomplish such a result. The purpose, not the power, of that legislature is to be ascertained.
The authorities cited in the judgment below sufficiently evince that the rule of law, governing the construction of statutes in reference to the particular now under consideration, is.there correctly stated. Judge Sharswood, in his note (37) to .1 Bl. Com. 92, expresses it thus: “ A statute shall always be so construed as to operate prospectively, and not retrospectively, unless, indeed, the language is so clear as to preclude all question as to the intention of the Legislature.” To the same effect, Smith in his Commentaries upon Statute and Constitutional Law, says: “ It is a general rule that statutes are not to be construed retrospectively, or so as to have a retroactive effect, unless it shall clearly appear that it was so intended by the Legislature.” He adds, “and not even then, if by such construction the Act would divest vested rights.” In The United States vs. Heth; 7 Cranch. 399, Patterson, J., says: “ Words in a statute ought not to have a retrospective operation, unless they are so clear, *284 strong and imperative, that no other meaning can be annexed to them, or unless the intention of the Legislature cannot be otherwise satisfied. This rule ought especially to be adhered to, when such a construction, will alter the pre-existing situation of parties, or will affect or interfere with their antecedent rights, services and remuneration, which is so obviously improper that nothing ought to uphold and vindicate the interpretation but the unequivocal and inflexible import of the terms and the manifest intention of the Legislature.” As to the effect, in this respect, of a repealing statute, Dwarris, in his treatise on Statutes, page 676, says : “ When an Act of Parliament is repealed, it must be considered, except as to those transactions passed, closed, as if it never existed.” Smith, in his wort above cited, says: "Inchoate rights generally derived under a statute are lost by its repeal, unless saved by express words in the repealing statute. It is otherwise, however, in regard to such civil rights as have become perfected far enough to stand independent of the statute, or, in other words, such as have ceased to be executory and have become executed.” Section 759.
It will be seen from these authorities that the mere repeal of a statute, without more, does not avoid or disturb transactions passed under its authority while in force, and that the party who affirms such retroactive operation must show in the statute such evidence of a corresponding intention on the part of the Legislature as shall leave no room for reasonable doubt. It is not necessary that the Court shall be satisfied that the Legislature did not intend a retroactive effect. It is enough, if it is not satisfied that the Legislature did intend such effect. Such evidence only as must compel assent can induce the mind of the Court to rest without disquiet, in the conviction of such intention. “ The confidence which it is the interest of every government to cherish in the minds of its citizens, will always strongly incline the mind to the conclusion that it could not have been the pur *285 pose of the Legislature to defeat a reasonable expectation suggested by its own laws,” or to avoid acts done, or destroy or abridge rights acquired under the sanction of its own authority. In the case now before this Court, the Confederate Government, by its legislation, induced Eliza E. North not only to engage the services of this appellee, for a valuable consideration, in the assurance that she had thereby made provision for the oversight and management of her property for a year thereafter, but also to pay into its own treasury a comparatively large sum of money in consideration of the waiver of its claim upon those services. The sense of justice of the dullest mind could not fail to be shocked by an exercise of power which, while the consideration price is retained, would deprive her of the services to which she has thus, in the confidence inspired by the law, purchased a double right. “Unless, therefore,” in the language of Johnson, J,, in United States vs. Heth, cited above, “ the words are too imperious to admit of a different construction, it will be the duty and the pleasure of the Court to vindicate the j ustice of the government, by restricting the words of the law to a future operation.” And what evidence is found in the terms and provisions of. this statute, which should compel a belief that the Congress intended a retroactive operation in reference to the class of cases to which the present belongs ? The words of repeal in the tenth section, broad as they are, cannot constitute such evidence of intention, for it has been seen that the law attaches no such import to mere terms of repeal, and the Congress will, of course, be presumed to have used language in contemplation of its legal effect. Nor can the general words of description in the first section alone, or in connection with the repealing section, sufficiently evince such intention. The one section (first) defines the class of persons who shall, “ from and after the passage of the Act, be in the military service of the Confederate States for the war;” and *286 this appellee falls -within the terms of definition. The other (tenth) defines the several classes of persons who shall, thereafter, be exempt from such military service, and this appellee is not within the terms of definition of any of these classes. It is claimed that it must hence be inferred to have been the intention of Congress to revoke the temporary exemption previously granted, and, regarding it as at' an end, to put him, with others in like circumstances, forthwith to active duty. But that the Congress itself did not regard these provisions as in themselves accomplishing such results is manifest from the introduction, into the Act, of the fourth section, which, upon such a view, would be wholly unnecessary. Every one between the ages of seventeen and fifty, whether he had before furnished a substitute or not, or being otherwise previously discharged or not, would be within- the terms of description of the first section, and so in the military service; and his having previously furnished a substitute, or been otherwise discharged, would not bring him within the terms of definition of any of the exempted classes enumerated in the tenth section. If, then, the provisions of these sections in themselves imported an intention on the part of Congress to arrest the operation of all past arrangements between the government and individuals in reference to exemptions and discharges, made under the authority of previous laws, why were the special provisions, to this end, of the fourth section added ?
But it is argued, in the language of the third ground of appeal, that the express proviso in the fourth section, “that no person heretofore exempted on account of religious opinions, and who has paid the tax levied to relieve him from service, shall be required to render military service under this Act, is equivalent to an express declaration that all other persons exempted by former Acts, who have paid the tax levied to relieve them from service, shall be required to render military service under the latter Act.” The argu *287 ment is, that the introduction of this proviso evinces the' understanding of Congress that, without it, persons of the class therein described would, under the operation of other provisions of the Act, notwithstanding their-having paid the stipulated price of exemption, have been forthwith in the military service; that the appellee and others in like circumstances who, it is said, have no higher claim against a retroactive operation of the repeal than those described in the proviso, must, in like manner, have been understood by Congress, in the absence of such express saving, to be put by the Act forthwith into the military service; and the failure to introduce such saving,' therefore, evinces the purpose of Congress that as to these such should be the effect.
By an Act of October 11/ 1862, persons holding certain peculiar religious opinions in regard to the lawfulness of war were “ exempted from military service,” upon condition that each one claiming the exemption should furnish a substitute, or pay a tax of five hundred dollars into the public treasury. This exemption was in terms general and without limit of time, as the considerations which induced it, if they justified it at all, apparently required that it should be. The provisions of the Act of February 17th, 1864, evince an entire abandonment of this policy, and, since its ratification, no one otherwise liable to military service can, on any terms, be exempted from that liability, out of respect merely to his religious scruples. Such a change of policy might be regarded as involving all those who bad hitherto enjoyed exemption from personal service, on the ground of their religious opinions, without distinction, in an immediate liability to military duty. This result would, as to those who had paid for the concession to their scruples a pecuniary consideration, have involved a breach of faith, and a violation of the plainest principles of commutative justice. The saving in the proviso of the fourth section was prob *288 ably introduced to allay the fears of those who apprehended such a construction of the law. The appellee and those in similar circumstances are not exempted generally from military service. By a special arrangement between the government and those in whose employment they are, they are, for a limited period, relieved from military duty, and may, without impropriety, be regarded as in the military service, subject to the temporary claim of the employer. In the course of legislation on the subject there was not laid a like foundation for an inference of the kind above adverted to, as to persons of the class to which the appellee belongs, and there was, therefore, not the same occasion to guard against such inference. It still continued to be the policy of the government to exempt from service a proper proportion of persons engaged in agriculture. The fact of providing new and altogether different conditions upon which such exemptions should thereafter be granted, did not at all imply a design to disturb existing exemptions for the same purpose granted upon conditions of valuable consideration prescribed by laws previously in force. There is, however, another, and, it may be, a more satisfactory manner of accounting for the introduction of this proviso. It has been seen that the condition upon which persons of these peculiar religious opinions were allowed their exemptions was in the alternative " to furnish a substitute or pay a tax of five hundred dollars.” As the fourth section had just declared that those who had furnished substitutes should not be any longer exempt, it might be plausibly argued that, as paying the tax was but an alternative for furnishing a substitute, a reasonable construction of this declaration would require that one who had chosen the alternative of paying the tax could not have been intended to be put in a better plight than his brother who had, at as great, perhaps greater, cost, furnished a substitute; and that his exemption *289 must also cease. The proviso may have been introduced, out of abundant caution, to exclude such a conclusion.
But the introduction of the proviso in the fourth section is the clearest recognition by the Confederate government of obligation to fulfil, to their utmost exigency, the engagements for exemption from military service which it had made upon an executed pecuniary consideration. The proviso “ hath this extent, no more.” It is without reason, other than this. Can it then be supposed that the Congress which was so careful to maintain the faith of the government when such maintenance involved the discharge for the full term of the war of a citizen capable of rendering, and otherwise liable to, military service, upon the consideration of five hundred dollars, intended that that faith should be violated in a class of cases where its maintenance involved a much less sacrifice on the part of the government, in the individual instance, and doubtless in the aggregate, upon the same pecuniary consideration. That the Congress did not intend the Act of February 17th, 1864, to have a retroactive operation in reference to the class of cases to which the present belongs, seems put beyond all reasonable doubt by the fact that when a retroactive effect is designed to be given to the Act, it is expressly so provided; as in the case of persons who had previously furnished substitutes, embraced in the terms of the fourth section.
While, therefore, the rule requires that the Act of February 17th, 1864, shall not be construed retrospectively, or so as to give to its provisions a retroactive effect, “ unless the language is so clear as to preclude all question as to the intention of the Legislature ” that it shall so operate, the terms and provisions of the statute, so far from thus clearly evincing such intention, do in fact, strongly import an opposite intention. The conclusion under such circumstances must be, that it was not the purpose of Congress, and therefore is not the effect of the Act, to revoke or disturb arrangements *290 which, like the present between' the government and Eliza E. North, had been perfected before its ratification, under the authority of the law then in force, and that the exemptions resulting from such arrangements continue until they expire by their own limitation. The judgment below is therefore affirmed and the appeal dismissed.
Dunkin', Wardlaw, Glover, and Munro, J. J., and Carroll, Ch., concurred.

Appeal dismissed.